And turn to our next case, which is United States v. Reyes. Good morning, Your Honors. Nacon Reyes' sentence of life imprisonment without the possibility of parole was both procedurally and substantively unreasonable. It was procedurally unreasonable because the court denied the third point for acceptance of responsibility, even though the government had consented to that point, and the court has no discretion to deny that point. And it did so as punishment for what the court mistakenly believed was Nacon Reyes' perjury at sentencing. Was that precise point raised, though? I know that there was a dispute about the acceptance of responsibility and whether his kind of witness-tampering stuff could be considered by the court overall, but did anybody raise the third point issue for acceptance of responsibility? That is, Your Honor, once the government says that he should get the benefit of the third point, you really have no discretion once you award the first two points. Did anybody ever phrase that to the district court? I don't think that the record would reflect that trial counsel put it in those terms. I mean, he persisted. That's your argument now, right? It's part of my argument. It's certainly not the whole argument, but it's part of the argument. And I think he preserved an objection to the denial of the acceptance of responsibility point. I don't think he, at the time of sentencing, used to say to the court, wait a minute, you can't. The third point is the wrong thing to do. Perhaps he should have, but it's clear that it is the wrong thing to do and that you have no discretion, if you're the court, to use that as a punitive measure when the government has consented to it. Is it clear that the judge took away the third point, meaning the one for early acceptance of responsibility, or just decided to take away a point? Oh, no. I think it's clear the judge took away the third point. The third point. I can't. I don't. I'm not sure I understand how you take away only one point unless it's taking away the separate third point. But I didn't get it. That's clear. I think if you look at the sentencing, it's absolutely clear. She says, I'm going to give you the two points for acceptance of responsibility, the first, you know, the three 1.1a points, but I'm not going to give you the third point. And that, I submit, by itself was procedural error. And we also can't. Let me ask you this question about, though. Why do we think it would make any difference whatsoever? I know that it may affect the range. In other words, with taking out that third point, the range would have been 360 to life, while I think it's a level 43 with the point as life. That was the final calculation, life, right? Exactly. What is it in the sentencing transcripts that suggests, the transcript that suggests this, the district court would have come to a different sentence if it had known about the different range? I can't say that the district court wouldn't have imposed life. I think what my position is, is that Naquan Reyes should have gotten a correct guideline sentence. And the correct guideline sentence would have contemplated a sentence of 360 months. And it's different to have a mandatory sentence of life than to have a guideline range. Well, of course, it's not mandatory in any event, is the point. In fact, the judge has discretion to give whatever sentence satisfies Section 3553a, is not bound to apply the guideline sentence. That's true. But I think as a practical matter, there's something different in asking a court to vary from the guidelines than to ask the court to impose a sentence on the low end of the guidelines. I guess there's also a question of whose burden it is, right? I mean, wouldn't it have to be the government's burden to show that there's something in the record that indicates, assuming we thought you were right, that this was an erroneous guideline calculation, am I wrong that it would be the government's burden to show that something in the transcript shows that the judge made clear that this would have been a life sentence regardless of the guidelines and this was all kind of an exercise going through the guidelines? I think that's true. And I don't think she did make clear that it would be a life sentence. Certainly she was disturbed by the videotape and used that to make a number of conclusions that we believe were erroneous, but she never stated it doesn't matter because I'm giving him life no matter what. She posited her sentence. She structured her sentence, so to speak, on the basis of taking off this third point and then putting it into a guideline sentence. But of course, I mean, the maybe more important point in the long run, you suggested that it was erroneous for the judge to draw the conclusions that she did from the videotape. And I'm wondering what's the basis for that, given that the videotape, I would think, is at best for your side susceptible to differing interpretations. But I rather thought that the judge's interpretation was the better one. And even if I didn't, don't you have to show that the judge couldn't have reached that conclusion by a preponderance of the evidence? That is my burden and I'd like to try to meet it here. Okay. I think you have to take the totality of the circumstances in this case. Naquan Ray is put guilty and he gives a plea allocution. And at the allocution, he says what he did in connection with the murder, that he contributed money with others and he disposed of the body. He did not say, I committed the murder, and the government did not ask him if he committed the murder. In fact, the government did ask him three questions to sort of firm up exactly what the allocation was, asked him if it was an obstruction murder. Did you and others contribute money? Now, if he contributed money, as the government was emphasizing, it seems to be that he's contributing money to someone else to commit the murder. And did you dispose of the body? So that's one. You have the plea allocation, which should mean something. It's where the government says, well, we don't have to elicit everything in the plea allocation, which is true. But it shouldn't allow falsehoods, which is sort of the position. It's takinghood. Didn't he withdraw his objection to the obstruction enhancement, though? Page 218 of the appendix. Oh, there's an additional two points that's added to the murder based upon a phone call he had with Randy Tyson after he was arrested, which is separate from the two points he got on the obstruction of the bank fraud. And counsel mistakenly, I believe, because he didn't want the court to play the videotape, says, well, then we withdraw that objection. I don't understand the strategy in that. And the court says, well, I'm going to play it anyway. And, you know, I think as we argue, I think from this record you could say counsel was ineffective because at that moment counsel should have said, well, then we reinstate our objection and let me explain why. The court said we'll play it anyway for the 3553A factors, right? Right. Once the court said I'm going to play it anyway, whatever strategy the counsel thought he was engaging in, in saying I give up my two-point obstruction objection backfired. And there was no point to give it up at that point because it had merit, because it was consistent. The notion that he was telling Randy Tyson to lie, and remember, she's a co-conspirator. She knew what was going on. The notion that he was telling her to lie is based upon the same premise, which is that this man, somebody else, he's lying when he says somebody else committed the murder, and he's lying when he said it was the result of other people's involvement. Getting back to the question, I mean, I've talked about the plea allocution, but there's not too much evidence in a plea case to look at. But the evidence the government did produce is really consistent with the plea allocution, with what Naquan told the probation officer and what he said at sentencing. First, there's the notion that he paid money. And the government, even at sentencing, emphasizes and elicits from Naquan that he had paid money for the murder. But especially this one. And your point is, to whom would he have paid money if he was going to do the killing himself and then dispose of the body himself? What is this pot of money for? I don't know. And the government says, well, that has superficial appeal. I think it has more than superficial appeal. I think it makes sense. And the second component of this is the cell phone tower evidence, which I'd like to go into in a little bit of detail, because if you really look at it, it supports the story that Naquan has told all along. Naquan and Ms. Thompson were in telephone contact a lot. But it ceased on July 19th. No more telephone contact after that. The day of the murder is July 22nd. The government says when Nicole Thompson made her last phone call, Naquan Reyes was a mile and a half away. That last phone call was to somebody that the government has referred to as the lure telephone. Some days he's the lure telephone, and some days he's the lookout telephone, depending on which theory the government is adopting at that moment. I think that's true. But to the probation department, and, you know, they didn't make it up. They speak with the government. It was the lure telephone. And, in fact, the probation department in paragraph 28 of the PSR says, this telephone lured Nicole Thompson to the murder site. So then the lure telephone calls Reyes at 537, 26 minutes later, presumably a mile and a half away. And the government has never said the lure telephone was not present at the murder. It says it's so he's calling Reyes, who's a mile and a half away, and the government says, well, it's plausible that they met up at some time. But it isn't really plausible because if they met up, then why is the lure telephone calling Reyes, and why is he pinging from a tower a mile and a half away? But it really is consistent with Reyes's perhaps less than perfect and articulate testimony about what happened, but it's consistent with where he says he was, the timing of when he says he got to the scene, and with what he has maintained throughout these proceedings, and the government permitted him to maintain at the plea allocution. Your theory is, of the cell phone evidence, is that the most consistent reading is that at 516, the lure, or at least what somebody told the pre-sentence report is the lure person, and Thompson are more or less in the same place. So they're effectively already meeting at 516. What happens between 516 and 537, you know, other than that person murders Thompson, and then at 537 calls Reyes to report that the deed is done? That's your theory. Well, the government doesn't seem to have much of an explanation as to what's going on between the bait, the lure person, and Thompson for 21 minutes plus. 21 minutes until Reyes is called, and then whatever time it takes Reyes to get to the scene so that Reyes can do the murder. That's the story. That is essentially what I'm saying. And I know they put it in a footnote, and at best they can say it's plausible that he had come to the scene. Well, when you asked – Your time has expired. Oh, I'm sorry. You've got a couple minutes reserved.  Thank you very much, Your Honors. Ms. Geddes. Good morning. May it please the Court. My name is Elizabeth Geddes, and I'm an Assistant United States Attorney in the Eastern District of New York. The District Court's sentence of Naquan Reyes to life imprisonment for the brutal murder that he committed was both procedurally and substantively reasonable. The Court properly found, or certainly was within her discretion to find, that when Naquan Reyes took the stand and testified that he did not personally commit the murder and was not present for the murder, both of which there was evidence was not accurate based on that recording that the confidential source made of Reyes in February of 2014, it was – Judge Towns was well within her discretion when she listened to both the recording and she listened to the defendant, Naquan Reyes, testify at the sentencing proceeding to say, I don't credit what you're saying today at the sentencing hearing. I do credit what you said when you did not know that your life was on the line. Now, I recognize that the government here is appropriately defending the District Judge's decision about this, but back in the District Court, did the government ever take the position that Reyes had personally committed this murder? The government took the position that it didn't matter. I understand it took the position that it didn't matter, but in any representation to the Court as to the government's theory of what did actually happen, I thought there was some implication that the government's theory was closer to what Reyes said than to what the government is saying. I'm not saying the government is saying it happened now, but that the government is now – that Judge Towns found and that the government is now defending. Am I wrong about that? I believe you are. I think that the government – and I don't mean to be mincing words here, but I think that the government simply never said who personally carried out the murder and who was present for the murder. What the government said was that there was no question that there was another individual who was involved in the murder plot, and we called that individual both a lure and a lookout for a reason. The individual was a lure because, based on the phone evidence, the government submitted that that individual who was using the phone lured Ms. Thompson to that location in Brooklyn where she was ultimately killed. To be clear, the government does not know where Ms. Thompson was killed. The government doesn't know what time Ms. Thompson was killed. All the government's evidence proved was that at some point there was that telephone call between Ms. Thompson and this person that we called the lure, and that they then appear to be in the same location by the fact that they are hitting – their telephones are hitting off of the same cell tower. And when you say that the cell phones are hitting off the tower, I'm not entirely clear on how this works. My last involvement in criminal investigations was before this wonderful new technology. The – I understand that when you make a call, that hits off a cell phone tower. Is it the case that the cell phone is continually pinging off towers even when phone calls are not being made? It can be because – and I don't think this is in the record, but the telephone providers keep track of where a telephone is, so it does periodically check in with that phone and would register it. Yeah, because there is information in the record about where Reyes is starting around 630, and there is information about where he is at 527, I think, or 527. But there's no information in the record about the interval between that call or whatever it is that gets to the Reyes phone at 527 and 630. And I was wondering if that evidence exists or not. It's not in the record, but is that something that the government has as to where Reyes might have been or what phone towers he was pinging off in that hour approximately? The government has all of the cellular telephone records that exist for that time period. And sitting here right now, I couldn't tell you if there was a hit between 527 and 630 when he leaves. Yeah. I mean, see, frankly, if I were the judge here, I don't know that I would care whether Thompson carried out this murder by himself or whether he, with full premeditation, planned with other people to have this witness killed and paid money to have it done and then participated in disposing of the body as a lesser factor. That would seem to me to be the critical issue, and I don't see how it matters that he did it with his own hand or not. It wouldn't matter to me anyway to the sentence. But that goes to the substantive reasonableness. And, you know, it seems to me that if it did matter to the district judge, it would be relevant to try to get all the information that is discussed. Now, again, maybe this wasn't really even raised. I don't know whether the cell phone evidence was really put to Judge Towns in an effective way. It wasn't. And I think we have to give Judge Towns credit for the context in which Mr. Reyes raised this. It was at the sentencing hearing where the defendant asked the court or through counsel asked the court, Judge, are you going to rely upon the statements that are on the consensual recording that was made in February of 2014? And the court says yes. And then for the first time he says, well, then I'm going to testify and I'm going to tell you that what I said on that recording was not actually what happened. And so the government had not put forth all of the evidence to show exactly where he was at what point and who carried it out. And, frankly, the government likely would have taken a similar position that it did, that as Your Honor pointed out earlier, the government's position was that it just didn't matter. But I think that the court was completely within our broad discretion in saying that whether it matters or not, what matters to me is that you lied. Well, I understand. So I guess that is a point, too, that if it does matter to the judge whether his statement was false as to what he did, because that suggests that he didn't really accept responsibility after all, at all, regardless of whether it's one point or three that comes off, if that's the position, then it does matter whether not necessarily in the abstract whether what kind of role you play in the murder matters, but in the concrete, the judge seemed to care about the falsehood. And that turns on the question of whether he did the killing. That's right. However, the court said that she had listened. The government at the court's request played the recording in its entirety for the court, the recording of this February meeting. The court also said that she had listened to it prior to the sentencing. And then she listened to Naquan Reyes's testimony. So she was in a position to listen to Mr. Reyes, watch his mannerisms as he answered the question, and say, I just don't believe you. And so given the broad discretion that sentencing courts are afforded to make those credibility determinations, and frankly the guidelines specifically provide with respect to acceptance of responsibility, that the sentencing court is in a unique position to evaluate the candor of a defendant. And she did that. And as a result of her unique position to weigh both his demeanor and his statements made on the recording and his demeanor in the statements made at the sentencing proceeding, she was within her discretion to find that he committed it. Can you comment about the third level of acceptance of responsibility? We have decisions that say once the government's moved or requested the third level and the court has decided to give two levels of acceptance of responsibility, the district court has no discretion, has to award the third level. You really don't talk about this in your brief, but it seems as if that's the law, that she did not have the discretion to just deny the third level of acceptance. Why am I wrong about that? I don't think she did deny the third level of acceptance. What she said was, and this is in the appendix at 248, I believe. She said that she is prepared to give the defendant a two-level reduction for acceptance of responsibility, but not a third point. And she uses the word a, not the third point, suggesting that she's referring to the level that only the government can move for. She was ---- What does that mean? The first two levels, if acceptance is given, my recollection is if the offense level is over 16, it's two levels and it's one if it's below that. Are you saying that one of those two levels was the one that she didn't give? I think that she made a determination that she wasn't going to give full acceptance of responsibility. And she would have been within her discretion to simply say, I'm not giving any acceptance of responsibility. Yeah, but she didn't. And I guess that's the question that I was asking Ms. Adelson. Is there a power in the district court to divvy up and just ---- I mean, I understand the court can say you obstructed justice, you don't get any acceptance of responsibility credit at all, but does the judge have the right to say, well, you sort of obstructed justice, so I'll cut it in half, or you really obstructed justice and I could take it all the way, but I'll cut you some slack and only give you two points instead of three or one point instead of two? That's not how the guidelines work, is it? That's true in part. However, two things I want to raise. The first is that the guidelines, of course, are not mandatory. And so the government submits that she can, if she wants, say, you know, in effect I'm giving him only partial credit and that that's an appropriate use of the credit. It may not make a difference when it goes back, if it goes back to the district court, because the court can do what the court thinks is the appropriate sentence and I, for one, don't see much weight to the idea that this was a substantively unreasonable sentence, even if Mr. Reyes's account is the true account of what he did. But technically, is it not the law that if there is a guidelines error, and again, this may be subject to issues of preservation and all kinds of other legal issues, but if there is a guidelines error, the sentence is procedurally unreasonable unless it's clear from the transcript that the judge would have given the same sentence? So I want to address that. I think the error would have been, let's say that the proper thing to do, based on her finding, was to simply not give any acceptance points. Then what she should have done was take everything away, so it would have been an even higher total offense level, and then any error is harmless. And so it shouldn't go back to the district court, because the error is simply up. Breyer. But, again, if a judge just says, I'm going to split the difference in some way, then it's not so clear. If the judge only wanted to take away one point, then how do we know what the judge would have done if told you can take away three points or no points?  That would strike me as somewhat ridiculous in a world in which sensible district judges are treating the guidelines as guideposts and not as a binding, but we have to deal with the law as it is. Of course, Judge. However, I think that Judge Towns was crystal clear that she decided that a sentence of life was appropriate. She did not fixate on the acceptance of responsibility point as, you know, as a judge as based on the fact that he lied. She really focused on his demeanor during that recording and that he had not accepted any remorse, had not shown any remorse for his conduct. And I think based on her very clear statements in both at the sentencing proceeding about the heinous nature of the crime and his attitude towards it, and, frankly, the statement that, and she highlighted this, that he said he would do it again if his life was on the line. I don't think there is any question that Judge Towns would have imposed the same exact sentence regardless of whether there was a full reduction for acceptance responsibility or no reduction for acceptance of responsibility. So unless the Court has any further questions, we'll rely upon our briefing, but we ask you to affirm the sentence. Thank you. Thank you. Ms. Edelson, do you have a comment? Thank you, Your Court. I want to start with remorse and something that the government has said in its papers and just said just now. It's true that the Court found that despite the fact that Nikon Reyes had written a letter expressing his remorse, had spoken at sentencing expressing his remorse, had made amazing progress in prison, shown by these letters of commendation and certificates, had four prisoners write in his behalf how much he helped them, had a retired Marine colonel who was a friend of the family say he was laden with guilt and sorrow. The judge relied on something that happened two years earlier when there's a lot of posturing. If you watch the whole tape, this is a man, Nikon Reyes, who's very influenced and easily manipulated by his older cousin. His father was murdered when he was 10, and this cousin, who's a seasoned criminal and knew what he was doing, and, you know, he's kind of demeaning Reyes during the tape, calls him a nerd, he laughs at him. So there's, you know, there's a lot of posturing and a lot of braggadicio, I think, going on during the tape. But that was two years earlier, and the notion that what happened two years earlier is static and that you can't have growth or maturity or change in two years is, I think, inconsistent with our principles of criminal justice and inconsistent with the evidence in this case, which really reflects that he did grow and change. Look, you know, the tape is the tape, but the government had the tape at the Reyes aliquot to a greater role in the crime. I can't stand here today and tell you why not, but it does matter because this was not just Reyes and this lure telephone. The government asks repeatedly, and there were others, and the government knows, as we sit here today, that this was a conspiracy involving others. And if Reyes had a role in it, but he wasn't the actual guy who put the whole thing in motion, he didn't suggest it, if he was acting on behalf of these people who got him involved in the bagging fraud in the first place, it very well might matter to the ultimate sentence. And I think the bottom line is that this is a very, this is most of your sentence you can have, and Naquan Reyes is entitled to a chance at a sentence based on accurate factual finding and accurate guidelines calculation. And I thank the Court very much for its time. Thank you, and we'll reserve the suit in this case.